**In The**
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-23-00095-CR**

**SHUN ERIC SIMON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court**
**Jefferson County, Texas**
**Trial Cause No. F20-34379-0**

**MEMORANDUM OPINION**

Appellant Shun Eric Simon appeals his conviction for continuous trafficking of persons, a first-degree felony. *See* Tex. Penal Code Ann. § 20A.03(a), (e). A grand jury indictment alleged that Simon

> in Jefferson County, Texas, during a period that was thirty (30) or more days in duration . . . from on or about the 12th day of September, 2019, through on or about the 22nd day of October, 2019, and anterior to the presentment of this indictment, engage[d] two or more times in conduct that constitutes an offense under Section 20A.02—Trafficking of Persons, namely:

1

The Defendant [] knowingly traffic[ked] [Susan[1]], a child younger than 18 years of age, and by any means caused [Susan] to engage in or become the victim of conduct prohibited by Section 43.05—Compelling Prostitution; and

The Defendant [] knowingly receive[d] a benefit from participating in a venture that involved trafficking [Susan], a child younger than 18 years of age, and by any means caused [Susan] to engage in or become the victim of conduct prohibited by Section 43.05—Compelling Prostitution[.[2]]

---

[1] We use pseudonyms to refer to the victim and her mother. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

[2] The jury was instructed that it could have found Simon guilty of Continuous Trafficking of Persons on either of the two grounds alleged in the indictment. The jury charge instructed the jury as follows:

Now, if you believe from the evidence beyond a reasonable doubt that Shun Eric Simon did then and there in Jefferson County, Texas, during a period that was thirty (30) or more days in duration, to wit; from on or about the 12th day of September, 2019, through on or about the 22nd day of October 2019, and anterior to the presentment of the indictment, engaged two or more times in conduct that constitutes Trafficking of Persons, namely:

1. The Defendant did knowingly traffic [Susan], a child younger than 18 years of age, and by any means caused [Susan] to engage in, or become the victim of, conduct prohibited by the Texas Penal Code, namely, Compelling Prostitution; or
2. The Defendant knowingly received a benefit from participating in a venture that involved trafficking [Susan], a child younger than 18 years of age, and by any means caused [Susan] to engage in, or become the victim of, conduct prohibited by the Texas Penal Code, namely Compelling Prostitution;

then you shall find the Defendant GUILTY of the offense of Continuous Trafficking of Persons.

Simon pleaded "not guilty," and a jury found Simon guilty as charged in the indictment and assessed punishment at thirty-eight years of imprisonment. Simon timely filed a notice of appeal. In one issue, Simon challenges the sufficiency of the evidence supporting the jury's verdict. We affirm.

Evidence at Trial

<u>Testimony of Amy</u>

Amy, Susan's mother, testified that Susan was twenty-one at the time of trial. According to Amy, Susan's father was in and out of Susan's life growing up, and Susan has "[a]nxiety, bipolar, and depression[]" and takes prescribed medication for her conditions. Amy testified that Susan has been treated by a psychiatrist since she was in the sixth grade and her anger issues over the years have progressively gotten worse. Amy testified that Susan has received both inpatient and outpatient mental health treatment, Susan does not always take her medication, and she gets angry when she does not take it, or when she is told "no," or when someone tells her they are going to do something and then does not follow through. According to Amy, when Susan gets angry she "goes ballistic[,] [s]he tear[s] stuff up, she calls [Amy] names, she calls the police, . . . run[s] away, just whatever comes to her mind." Amy testified that Susan started running away at about age sixteen, she runs away at least twice a month, and she is often gone "till things g[e]t bad on the streets[]" and she

returns home. Sometimes, Susan was not allowed in Amy's home because Amy "was tired of repairing [her] property that [Susan] was destroying[.]"

According to Amy, when Susan began dating Simon in 2019, Amy thought he looked much older than Susan, and he told Amy that he was twenty-one years old. Amy testified that she believed him, and when she told him that Susan was only seventeen years old, "he said he didn't care[,]" and later Amy found out that Simon was much older than twenty-one. Amy testified that Simon began coming to Amy's house more often and initially he was not allowed to stay there because she did not know him, but then Amy later allowed him to stay at the house because Susan kept running away with him and Amy felt like it was better and safer than Susan being "on the streets." According to Amy, when Susan ran away Amy would often find her at "like a trap house" where drugs and illegal activity were common or hiding at a park. Amy testified it was a difficult decision for her to allow Simon to stay at her house, that she tried to set "ground rules" for Susan and Simon while living at her house, but that the rules did not work, and Susan and Simon would come and go from the house whenever they wanted and without telling Amy where they were going. Amy testified that Susan and Simon would fight often and sometimes would sleep all day. After a couple of months, Amy caught Susan and Simon at the house smoking something that looked like a blunt "that didn't smell like average marijuana[]" and she asked them to leave. After this incident, Amy thought Susan

4

was engaging in more drug use because she would smoke a substance and be asleep in a matter of seconds. Amy often had to call the Beaumont Police Department to come to her house because of disturbances resulting from disagreements between Amy and Susan and between Amy and Simon. At one point, Amy had to have the Beaumont Police Department issue a trespass warning to Simon to keep him from coming to her house but he still came back and Amy had to call the police. Amy testified that Susan would become "[e]rratic[,]" "go off on the deep end[,]" and chase after Simon when Amy would prevent him from being at the house.

So that Amy could get in touch with Susan, Amy gave Susan a cell phone through T-Mobile that was activated on August 18, 2019, but Susan told Amy she lost the phone in October of 2019. Amy thought the phone would be found, but after it was not found, Amy terminated the phone's service on August 16, 2020. Amy verified from T-Mobile business records admitted into evidence that the records matched the phone number for the cell phone she had given Susan. According to Amy, she was not aware that Susan was being trafficked during August, September, and October of 2019. Amy explained that had she known Susan was being trafficked, she would have notified law enforcement. Amy testified that when she was at the courthouse related to charges against Susan for assault on a public servant, she learned that the Beaumont Police Department was investigating the trafficking of Susan. Amy testified that in hindsight, some of Susan's and Simon's activities at the

5

house were concerning, like one incident when Simon had been "trespassed warn[ed]" but she found him naked, hiding in a closet, and Susan in her underwear. In another incident when a UPS worker had parked outside around the corner of her house at 5:30 or 6:00 a.m., she saw the UPS worker and Susan talking and then saw them hug, after which the UPS worker left. On both of these occasions, Amy called the police. In hindsight and in reflecting on these situations, however, Amy explained that she believed Susan and Simon were "setting up some illegal activity."

Testimony of Detective Charles Duchamp

Charles Duchamp, a detective with the criminal investigation division for the Beaumont Police Department, testified that he received extensive training related to human trafficking and he trains other officers on how to recognize indicators that trafficking may be taking place. According to Detective Duchamp, on October 24, 2019, the Beaumont Police Department received a tip from the National Human Trafficking Hotline made by Susan's dad that Susan was being trafficked by an individual named "Shawn," and the tip provided a phone number that was listed in online ads. Duchamp testified that law enforcement uses tools such as Traffic Jam and Spotlight to scroll ads when looking for and investigating trafficking victims online, and these tools filter the ads on websites like Skipthegames and can group together ads that may be related based on the ads having a common phone number or a shared photograph. Duchamp testified that when he ran the phone number

6

provided in the tip through one of these tools, ads revealed photographs of a female whom Duchamp was able to identify as Susan by locating Susan's previous mugshot from software used by the Jefferson County jail. Duchamp testified that at that point he believed he had verified a potential case involving human trafficking of a minor child. According to Duchamp, the Beaumont Police Department had a previous interaction with Susan on October 22, 2019, and they had taken her to jail, so she was incarcerated at the Jefferson County jail when Duchamp began investing the tip. Duchamp testified that patrol unit camera footage from the incidents with Susan that were uploaded into the Department's system helped confirm that Susan was the individual depicted in the photographs in the ads. Duchamp testified that the Beaumont Police Department's records management system also identified previous contacts the Department had with Susan and an individual named "Shun." Duchamp identified State's Exhibit 18 as a still image from the patrol unit from the video he reviewed of a Beaumont Police officer's interaction with Susan and Simon on October 21, 2019, and the exhibit was admitted into evidence. According to Duchamp, the interaction was near a hotel on College Street, and the footage supported the hotline tip because Simon was an older male subject with Susan, who was younger, and they were together in the footage. Duchamp testified that at the time of the incident, Shun Simon would have been around thirty-three years old, which concerned him because trafficking cases often involve an older male taking

7

advantage of a younger female. Duchamp identified Shun Simon as the defendant at trial.

Duchamp testified that Skipthegames is a website where a user will create a username and password to log on and use the service and post ads. According to Duchamp, an email address and phone number are required to sign up for the service, and once an ad is posted, phone calls and texting are the predominant ways that "buyers" communicate with the person they are trying to reach in the ad. Duchamp testified that, based on his training and experience, Skipthegames is aware that their website involves a lot of illegal activity, but the administrator of the website cooperates with law enforcement and investigations to provide subscriber information (such as names, phone numbers, and dates the ads were created) when law enforcement submits requests for subscriber information for specific ads.

Duchamp identified State's Exhibit 19 as the records Skipthegames provided to him after he requested information on "several dozen" ads related to his investigation in this case, and the exhibit was admitted into evidence. Duchamp testified that from these records he learned that three Skipthegames accounts were associated with ads involving Susan, and that often multiple ads of Susan would be posted on the same day. According to Duchamp, it is common for there to be multiple accounts associated on Skipthegames because the website only allows a user to post a limited amount and by having multiple accounts a user may have their

ad appear more often and at the top to get more views. Often in trafficking cases, multiple phones are also involved so that one phone may be logged for one account and another phone logged for another account. Duchamp testified that the ads on Skipthegames have a unique vernacular often used among the "buyers" and the individuals selling sex, including the use of initials of sex acts, and terms such as "dates" for meeting up to buy sex, "donation" for payment for sex acts, "roses" for dollars (i.e., 80 roses refers to $80), "lick" for the "buyer" of sex, "hitting a lick" for someone coming to buy sex, "QV" for a quick visit (typically fifteen minutes) for sex, and "HR" for an hour of sex. Duchamp testified that probably "five to ten buyers respond to one ad." Duchamp's Department would post "decoy ads" to elicit "buyers" for underaged girls and sometimes within a minute a text message comes through, although some "buyers" want to talk on the phone to verify the ad was not posted by law enforcement. Sometimes the phone number associated with the ad would be in the title on the photograph in the ad, or if not, the "buyer" could contact the phone number associated with the ad by clicking on a button on the ad that provides the "buyer" with the phone number to text or call.

Duchamp testified that as a result of his investigation in this case, Skipthegames cancelled the user accounts associated with the ads. One of the user accounts involved in the posting of ads of Susan was associated with an email address that included Simon's first and last name. According to Duchamp, the

9

Skipthegames records indicated that the account using Simon's name in the email address was first accessed on September 12, 2019, and an ad was posted from that user account with a phone number in the title of the ad that matched the phone number provided by the hotline tip, except the last digit had been left off. Duchamp testified that fifty-two ads of Susan were posted from that user account, and the last ad was posted on October 22, 2019.

Duchamp testified that the second and third user accounts were email addresses that included Susan's first and last name. According to Duchamp, fifty-seven ads of Susan were posted from September 22, 2019 through October 9, 2019 from the second user account, and thirty-one ads of Susan were posted from the third user account from October 1, 2019 through October 10, 2019. Duchamp testified that there was a lot of overlap of the dates of posting ads from the three accounts, and a total of 140 ads of Susan were posted of Susan from September 12, 2019 to October 22, 2019.

Duchamp testified that his investigation revealed three phone numbers were associated with the ads involving Susan. Based on his training and experience and his investigation that included among other things subpoenas to cell phone service providers and TextNow, he believed that one of the phone numbers associated with the ads involving Susan was for the phone that belonged to Susan that her mother had purchased for her, one of the phone numbers was for a "burner phone" that

belonged to Simon, and one of the phone numbers was linked to a TextNow texting app that does not use an actual carrier service and is not an actual separate phone, but the number was also associated with one of Susan's email accounts and her first and last name were used in the user name for the TextNow account. Duchamp learned through a subpoena response from Google that the email account that included Simon's first and last names in the account name and that was used for the Skipthegames user account that posted ads involving Susan was associated with a "Shun Simon," and State's Exhibit 31, which included the records from Google was admitted into evidence. Duchamp testified that, based on the information provided by Google, he believed that the email account belonged to Simon. Duchamp testified that he subpoenaed records from Apple for records related to the other two email accounts associated with the ads involving Susan that had her first and last name in the account name, and Apple's response to the subpoenas resulted in the production of records that led Duchamp to believe that one of the accounts was Susan's because it was tied to her phone number. As for the other email account with Susan's first and last name in the account name that was associated with the ads involving Susan, Duchamp testified that, although he was unable to obtain records on that account, he had no reason to believe that the email belonged to someone other than Susan.

Duchamp identified State's Exhibits 20 through 30 as eleven of the ads of Susan on Skipthegames that he obtained from the website and that were

representative of the 140 total ads involving Susan. The exhibits were admitted into evidence. Duchamp testified that the ads were sexually explicit and that the photographs of Susan included in the ads were considered child pornography under Texas law.[3] Duchamp testified that during his investigation he learned that some of the photographs of Susan in the ads were taken at Susan's mother's house and that the backgrounds of the photographs were consistent with rooms and furniture in Susan's home. He also was able to identify Susan as the person in the photographs because of her face and identifying tattoos.

According to Duchamp, a search warrant was obtained for the phone number that was linked to Simon.[4] The phone was located in Susan's property at the Jefferson County jail when Susan was arrested on October 22, 2019.

Photographs of the phone were admitted into evidence. Duchamp testified that another detective used software to extract data from Simon's phone. After the investigation, Duchamp received the same certification, and in preparation for trial he used the same method to pull the data from the phone because the other detective

---

[3] Because Simon concedes that Susan was engaging in prostitution through these ads, we need not describe in detail the ads or photographs. *See* Tex. R. App. P. 47.1.

[4] Susan testified that this phone number was the number for the phone that belonged to Simon, and Duchamp ultimately concluded that it was Simon's phone because it had numerous pictures of Simon on it, texts to Susan's phone number, the photographs of Susan used in the Skipthegames ads, and an email account on the phone that had Simon's first and last names in the account name.

was out of town and could not testify. State's Exhibit 42, a preliminary device report for the cell phone that provides specifics such as the kind, model number, phone number, and vendor for the phone, was admitted into evidence. State's Exhibit 43, an extraction report from Duchamp's extraction of the phone's data that identified wireless networks accessed by Simon's phone, was admitted into evidence. Duchamp testified that one of the wireless networks the phone had used was the wireless network for the hotel on College Street, a hotel Duchamp testified is often used to facilitate prostitution. State's Exhibit 44, records of a user account for Skipthegames that was created on September 12, 2019, with the email account that included Simon's first and last name and was associated with the ads involving Susan, was admitted into evidence. Duchamp testified that this information was stored in Simon's phone and extracted from the phone. According to Duchamp, State's Exhibit 48, a web history for Simon's phone, was admitted into evidence, and it showed that the phone had accessed the Skipthegames website 601 times in a short time frame, that the last time the website was accessed was on October 22, 2019, and the dates that ads were posted from the phone to the website matched dates when Susan's ads were posted. Duchamp testified that he found no evidence from the phone that revealed payments through apps like CashApp or Venmo, and that Duchamp believed that the payments Susan and Simon received were made in cash. State's Exhibit 45, which Duchamp identified as a call log from Simon's phone to

Susan's phone number, was admitted into evidence, and Duchamp testified that the call log showed that the first call between Simon's phone and Susan's phone was on September 28, 2019, and the last call between the phones was on October 21, 2019, the day Simon was arrested. Duchamp also testified that State's Exhibit 46 was a report showing "thumbnails" of images extracted from Simon's phone. According to Duchamp, the report shows images of Susan, and some of the images of Susan are on the ads. State's Exhibits 46A through 46U, the individual images from that report, were admitted into evidence. Duchamp testified that these photographs, along with the information fields from the report admitted as State's Exhibit 46, helped him determine that the phone was the phone that took the same photo of Susan that was posted on the ad and that the phone was used to exploit Susan. Duchamp also testified that, in his opinion, some of the photographs of Susan on Simon's phone and posted in the ads were taken by someone other than Susan. According to Duchamp, the fact that the phone also contained images of Simon helped corroborate that the phone belonged to Simon.

Duchamp also testified that Simon's phone contained text messages with people attempting to solicit sex based on the ads involving Susan, and that reports admitted into evidence as State's Exhibits 49 through 58 represent the text conversations between Simon's phone and "buyers" that were soliciting sex in exchange for money. According to Duchamp, the language used in the texts was

14

common for how "buyers" communicate with people they are contacting with the ads, such as discussing "rate," meet-up locations, verifying that the ad is not fake or law enforcement, asking for more photographs, and using terms such as "donation" to mean money, "hh" to mean a half-hour visit, and "QV" to mean a fifteen minute quick visit. Some of the texts between the potential "buyers" and Simon's phone also specifically referred to sexual acts instead of using vague language. Duchamp testified that photographs of Susan were sent from Simon's phone when potential "buyers" would ask for more photographs, and texts negotiating the amount of money to be paid for certain acts on "dates" were sent from Simon's phone. According to Duchamp, the texts often suggested meeting up at the hotel on College. One "buyer," Duchamp explained, sent a text to Simon's phone, in which the buyer asked whether the person was "From skip the game." The person that had Simon's phone responded, "Yes." Relying on the texts that police extracted from Simon's phone following its search, Duchamp testified that one potential "buyer" texted asking for an explicit photograph, and the person with Simon's phone then texted a photograph of Susan's genitals to the potential "buyer."

Duchamp testified that it was important that he found many text messages on the phone between Susan's phone and Simon's phone, and State's Exhibit 59, a report of the text messages between them and extracted from Simon's phone, was admitted into evidence. Duchamp testified specifically as to several of the texts and

15

that, based on his training and experience, these texts showed the following: (1) Simon helping Susan negotiate prices and meeting places and communicating with "buyers" despite Susan having her own phone; (2) Simon attempting to "keep tabs" on Susan by making sure her phone was charged and checking her location to know what was happening with the money she was earning; (3) Simon texting her asking her to text him when she was finished with a "buyer" so he could make sure more time was not spent with the "buyer" than was paid for; (4) Susan texting Simon letting him know how far away the next "buyer" was from their scheduled meeting place; (5) Simon controlling the money by questioning whether Susan was getting paid the right amount and her responses that she had not spent the money; (6) Simon texting her to buy him food with the money he earned; and, (7) when Susan questioned who the money she earned belonged to, the text Simon sent her states, "For us."

Duchamp testified that law enforcement attempts to focus on the victim in these situations and get them help, that often the victims have had bad experiences with law enforcement, and that the "trauma bond" between the victim and trafficker is often strong because they think the trafficker "loves them." According to Duchamp, after his investigation, he contacted Susan's court-appointed attorney for Susan's other criminal case and let her know about his investigation and how Susan had been exploited, but Susan was initially not ready to talk with law enforcement

16

or consent to a SANE exam. After Susan was in jail for several months, Duchamp learned that Susan was willing to have a medical exam, and Duchamp arranged for her to be transported to St. Elizabeth Hospital for the SANE interview and exam. Duchamp testified that in January of 2020, Susan's court-appointed attorney for the other case contacted Duchamp and said Susan was willing to talk to him, and arranged to conduct her interview at the courthouse on the same day the trial court conducted her hearing in the other case. According to Duchamp, in the past law enforcement was not focused on getting help for victims of these types of offenses and it would be reasonable for Susan to think that she was in some kind of trouble and scared to talk. Duchamp testified that Simon had been released from jail and showed up at Susan's hearing and they made him leave, and that although he did not believe Susan knew Simon was there, Duchamp believed that Simon was attempting to intimidate Susan, and Simon's presence could have been detrimental to Susan and potentially affected her willingness to talk to Duchamp. State's Exhibit 60, a photograph of Simon in the public gallery in the courtroom on the day of that hearing, was admitted into evidence. Duchamp testified he interviewed Susan after the hearing.

Duchamp testified that, based on his investigation and his training and experience, he believed that Susan was "exploited and advertised on the internet" and that this was something that Simon and Susan were doing together. Duchamp

17

testified that based on the evidence it was his opinion that when Susan lost her phone for a period of time, Susan and Simon had shared a phone. He also thought that Susan and Simon had both posted ads and were both likely texting with "buyers." Duchamp testified that in his opinion Simon had benefitted from Susan engaging in prostitution by receiving food, a place to stay, cigarettes and cigars, narcotics, and all of the things that they had purchased together by spending the proceeds from Susan's selling sexual services for money. Duchamp testified that from his investigation, he believed that this was a situation where Susan was willing to participate and work together with Simon, her trafficker, to engage in prostitution. According to Duchamp, it is common for human trafficking victims to not know that they are victims and for traffickers to convince the victims that they are voluntarily engaging in prostitution by taking advantage of them and manipulating them into believing that they are just making money together. Duchamp testified that Susan at age seventeen was legally capable of consenting to having sex with Simon if she wanted to, but that Susan was not capable of consenting to engaging in prostitution or to becoming a victim of exploitation or human trafficking and that the human trafficking offenses protect those up to age eighteen. Duchamp testified that even if Susan came up with the idea to sell her body to make money, if Simon facilitates the endeavor or receives a benefit such as money, food, drugs, or a place to stay from the endeavor, then that is illegal sex trafficking. According to Duchamp, under the

18

statute for trafficking of persons, if the victim is under eighteen the trafficking can be "by any means[,]" which can include helping to rent a hotel room or even suggesting prostitution to someone under eighteen as a way for that child to make money, and that force, fraud, or coercion is not required if the victim is under eighteen. Duchamp testified that even if Susan believed at the time that she was voluntarily engaging in prostitution, it was still illegal because she could not consent to it because under the law she was a child.

Testimony of the Sexual Assault Nurse Examiner (SANE)

The SANE testified that she performed an exam on seventeen-year-old Susan at St. Elizabeth Hospital on December 18, 2019. The medical records from St. Elizabeth Hospital were admitted into evidence. The SANE testified that at the time of the exam Susan was considered a child under the law for trafficking because for that purpose a child would be a person younger than 18 years old. According to the SANE, Susan was brought in for the exam by correctional officers because Susan was incarcerated at the time, and Susan consented to the exam. According to the SANE, because Susan reported that her last sexual contact was more than five days prior, the SANE performed a nonacute exam, meaning no forensic specimens were collected.

The SANE testified that when she was documenting the history Susan provided, Susan reported that Simon had been her boyfriend for four months and

that she had met him six or seven months earlier. According to the SANE, Susan reported that on the day she met Simon at the park, she learned he did not have a place to stay, Simon went home with Susan, and her mother agreed to let him stay at the house temporarily despite knowing he was thirty-three years old. The SANE testified that Susan reported that she first had sex with Simon at a motel about a week after they met, that they had sexual intercourse fifteen or twenty times while dating and oral sex about twenty-five times, and that Simon slept with her in her bed until they were both arrested. The SANE testified that Susan reported that on the day she was arrested, she was at the park, and she refused to go into the restroom with a man, he took her five dollars and ran, and after she chased him, he punched her, she bit his ear, and he called the police. The SANE testified that Susan stated that the responding officer told Susan, "You're going to jail," and "I know exactly who you are[,]" and he took her to jail.

The SANE testified that Susan did not mention engaging in prostitution and only mentioned having two sexual partners – a boyfriend prior to her relationship with Simon, and Simon. According to the SANE, it is common for trafficking victims to refuse to admit to being trafficked. The SANE testified that although Susan reported that Simon was her boyfriend, the SANE identified several "red flags" that raised concerns that Simon was trafficking Susan: that Simon was older than Susan; that she mentioned the motel room; that she had many dealings with law

20

enforcement; that law enforcement knew her as a different name; the story about the events at the park leading up to her arrest that did not make sense and seemed like there was "something more to it[;]" and that she was guarded when answering questions, and that Susan paused for long periods after being asked a question and responded with a vague answer. The SANE also testified that Susan's mental health history, including a suicide attempt several years before, a history of running away, and an unstable home life, made her vulnerable to trafficking.

After performing the physical exam, the SANE testified that she noted in her report that Susan had tattoos that are common with trafficking, that the genital exam revealed two well-healed hymenal tears "consistent with a penetrative injury[,]" the lab work indicated Susan tested positive for bacterial vaginosis, but Susan tested negative for sexually transmitted diseases.

According to the SANE, victims of trafficking are often young and vulnerable and feel cared for and important by those that are trafficking them. The SANE testified that, based on her training and experience with treating trafficking victims, it is a lengthy process for trafficking victims to acknowledge or talk about being trafficked and that there is "a cycle of reward and punishment" similar to domestic violence victims where the victims blame themselves and "can't see the whole picture." The SANE testified that she has often treated patients for trafficking or sexual abuse that deny the trafficking or sexual abuse, and even later when evidence

21

of the trafficking or sexual abuse surfaces, the victims still never acknowledge or admit to it.

<u>Susan's Testimony</u>

At the time of trial, Susan was twenty-one years old. Susan told the jury she did not want to testify in the trial. Susan explained to the jury that at the time of trial she was incarcerated, she had been incarcerated for two years, she had eight-and-a-half months left on her sentence, and her incarceration was for convictions from before she met Simon. According to Susan she did not want to go back to prison, and when released from jail, she wants to "start over" with a job in cosmetology. According to Susan, she had argued with her mother in the past, made bad choices, and said things she regrets. She did not have much of a relationship with her father. Susan testified that she has received treatment in the past for "[d]epression, [her] temper, [and] making wrong decisions." Susan testified that at the time of trial she was taking medication for her mental health issues, but she did not think it was helping. According to Susan, she has difficulty remembering things because her past use of synthetic marijuana impacted her memory. Susan testified that she has been sober "[g]oing on three years." Susan testified that she was nervous about testifying, and that it was "complicated" being present for Simon's trial.

Susan identified the defendant as Simon and testified that she first met him in 2019 at a park in Beaumont, which was close to her mother's house. According to

Susan, she met Simon when she was seventeen and Simon was in his early thirties, and Susan had just broken up with her boyfriend. Susan testified that while she and Simon dated, they would smoke synthetic marijuana and that her mother did not like that Susan was dating Simon. Susan testified that her mother did not know Simon's age, and Simon would stay at her house sometimes. According to Susan, during that time she and her mother would argue and Susan and Simon would leave and go stay at another house. Susan testified they would also stay sometimes at a hotel on College Street to get away and because she was "selling herself."

Susan testified that Simon did not have a job and she and Simon would come up with ways to make money like her "selling [her]self." According to Susan, Simon knew that she was "selling herself[,]" and that she would post naked photographs of herself in ads she posted on the website Skipthegames, but she said that Simon did not help her post the ads. Susan testified that she and Simon "shared a phone" and the photos were on that phone, and she admitted that there was a Skipthegames account with Simon's email address. Susan testified that it would not surprise her if there were three Skipthegames accounts used, but she only knew of two of them "'cause when [Simon's] phone broke, [she] made one on [her] phone." Susan testified that she would use the phone number for the phone her mother had given her and Simon's phone number to post her ads and that Simon knew she was using his phone to post the ads. When asked at trial why she needed to use more than one

23

phone number to post her ads, she answered, "That's a good question. I don't know. I just did it." Susan testified that she also used a phone number from a texting app called TextNow. At trial, Susan identified her phone number and Simon's phone numbers.[5] Susan acknowledged that she knew that as part of the investigation law enforcement had downloaded data from Simon's phone.

According to Susan, she and Simon were stopped by Beaumont police in October of 2019, after Simon "got into an argument with somebody, and Family Dollar called the police." Susan testified that she had drugs on her when the police stopped them, that earlier that day at the motel Simon had the drugs, and that they would pass the drugs back and forth because they shared drugs and money. Susan testified that she did not know how Simon made money when he did not have a job. When asked if Simon got his money from criminal activity, Susan answered, "Ms. [Prosecutor], I don't want to be here right now." Susan admitted she was scared to be at trial because she "d[id]n't want anything to do with this." According to Susan, Simon never made her do anything she did not want to do, but she agreed that she and Simon would do things that they should not be doing, such as having sex with people for money. Susan admitted that having sex with people for money was the

---

[5] The phone number Susan identified as her phone number matched the phone number that Duchamp concluded belonged to Susan, and the phone number Susan identified as Simon's phone number matched the phone number that Duchamp concluded was Simon's and was the same phone that Duchamp obtained through a search warrant and for which he performed the data extraction.

only way she could earn money, and she would buy things for Simon with the money, like a gun she bought illegally and gave to him as a surprise.

According to Susan, from her ads posted on Skipthegames, she would have an average of ten to fifteen male "buyers" that she would meet with in a day, and the illegal drugs she was taking helped her become numb to what was going on. Susan testified she charged the same thing every time, $150 or $80 for a fifteen minute "visit." Susan testified that the men she would meet up with were not always the nicest of men, and that sometimes Simon was around to help make sure that she was safe and nothing bad happened, but that she "did the texting for [her]self." When asked if Simon would ever text "buyers" for her and help arrange the "dates," Susan testified, "I mean, I can't tell you what he did when I wasn't there." When asked if the 131 pages of text messages downloaded from Simon's phone would be the best representation of what was going on between Susan and Simon during that time, Susan answered, "Yes, ma'am." When Susan was asked if there were text messages in the 131 pages where Simon was telling Susan how much time to be with a date or how much money to charge would that be accurate for what was going on back then, Susan testified, "I don't know." Susan admitted that her answer was different from her first answer, she still cared about Simon, and she did not remember the passwords to Skipthegames or any of the email addresses.

25

She testified that she would give some of the money she earned from meeting up with the men to Simon because "He was my dude[,]" and if Simon needed something like food or drugs, she would buy it for him with the money she earned. According to Susan, she and Simon could not rent a hotel room because she was not old enough and he did not have identification, so the "buyers" would rent the room and then after Susan's "date" with the "buyer," Simon and Susan would get to stay in the room after the "buyer" left. Susan testified that she had never known Simon to have a job, but that there was nothing preventing Simon from getting a job to make money in a legal way.

On cross-examination, Susan testified that Simon knew what Susan was doing to make money but that he had his own money, and she had her own money. Susan testified that Simon did not encourage her to make money this way but that he "just went with it[,]" he let her do what she wanted to do, he did not want her to earn her money that way, and he did not post any of the ads for her or help her in any way earn her money.

Issue on Appeal

In a single appellate issue, Simon challenges the sufficiency of the evidence supporting the jury's verdict. Simon concedes that "the phone records and ads indicated that [Susan] was in fact engaging in prostitution[,]" and he does not contest that she engaged in prostitution over a 30-day period during that time. Simon argues

that the State's case "rested entirely upon the conjecture and opinions" of Detective Duchamp and the SANE. According to Simon, Susan denied that Simon trafficked her; Detective Duchamp's testimony "was often couched in what happens very often in trafficking cases, and then analogizing that to the investigation of [Simon];" the evidence established that Susan and Simon "were romantically involved, used drugs together, shared money, and shared their lives together, and nothing more[;]" Duchamp assumed that the text messages from a phone number associated with Simon were sent by him; Susan did not report to the SANE that Simon trafficked Susan; and the SANE's testimony consisted of concerns she gained during her conversation with and examination of Susan "which were entirely conjecture and unfounded opinion." Simon argued that no rational juror could have found the elements alleged in the indictment to be proved beyond a reasonable doubt.

Standard of Review and Applicable Law

In reviewing the legal sufficiency of the evidence, we review all of the evidence in the light most favorable to the verdict to determine whether a rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We give deference to the factfinder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. If the record

27

contains conflicting inferences, we must presume that the factfinder resolved such facts in favor of the verdict and defer to that resolution. *Brooks v. State*, 323 S.W.3d 893, 899 n.13 (Tex. Crim. App. 2010) (citing *Jackson*, 443 U.S. at 326); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The jury as factfinder is the sole judge of the weight of the evidence and credibility of the witnesses, and it may believe all, some, or none of the testimony presented by the parties. *See Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000); *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995). The appellate court does not reweigh the evidence nor determine the credibility of the evidence, nor does it substitute its own judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

"Direct and circumstantial evidence are treated equally: 'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.'" *Clayton*, 235 S.W.3d at 778 (quoting *Hooper*, 214 S.W.3d at 13). Each fact need not point directly and independently to the guilt of the defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Lucio v. State*, 351 S.W.3d 878, 894 (Tex. Crim. App. 2011); *Hooper*, 214 S.W.3d at 13; *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993).

Section 20A.02 of the Texas Penal Code provides, among other things, that a person commits the offense of "trafficking of persons" if he knowingly:

> (7) traffics a child . . . and by any means causes the trafficked child . . . to engage in, or become the victim of, conduct prohibited by:
> . . .
> (H) Section 43.05 (Compelling Prostitution);
> . . . [or]
> (8) receives a benefit from participating in a venture that involves an activity described by Subdivision (7)[.]

Tex. Penal Code Ann. § 20A.02(a)(7)(H), (a)(8). A person commits the offense of "continuous trafficking of persons" if, during a period that is thirty or more days in duration, the person engages two or more times in conduct that constitutes an offense under section 20A.02 against one or more victims. *Id.* § 20A.03(a). That offense is a first-degree felony "punishable by imprisonment in the Texas Department of Criminal Justice for life or for any term of not more than 99 years or less than 25 years." *Id.* § 20A.03(e). "Traffic" means "to transport, entice, recruit, harbor, provide, or otherwise obtain another person by any means." *Id.* § 20A.01(4). "Child" means "a person younger than 18 years of age." *Id.* § 20A.01(1). A person commits the offense of Compelling Prostitution if the person knowingly causes by any means a child younger than eighteen years to commit prostitution, regardless of whether the actor knows the age of the child at the time of the offense. *Id.* § 43.05(a)(2). A person commits the offense of Prostitution if the person knowingly offers or agrees to receive a fee from another to engage in sexual conduct. *See id.* § 43.02(a).

29

Analysis

The jury heard Duchamp testify that based on his investigation that one of the phones posting the sexually explicit ads prostituting Susan belonged to Simon, that one of the three email accounts used to create the Skipthegames user accounts where the ads were posted was linked to Simon, that the ads from all three user accounts were posted from September 2, 2019 to October 22, 2019, and that Simon's phone was used in Susan's sexual exploitation. The jury was presented with the ads, posted on Skipthegames, that contain pornographic images of Susan. The jury heard Duchamp testify that police discovered pornographic images of Susan on Simon's phone when the phone was searched, and Duchamp linked those pornographic images to the images of Susan which were used in the Skipthegames ads. The jury heard Duchamp's testimony that, based on his investigation and his training and experience, he believed that Susan was "exploited and advertised on the internet" and that this was something that Simon and Susan were doing together. Duchamp explained to the jury that it was his opinion based on the evidence that for a period of time Susan and Simon shared a phone when Susan lost her phone, that Susan and Simon were both posting the ads, that it is likely they were both texting with "buyers," and that Simon benefitted from Susan engaging in prostitution by receiving food, a place to stay, cigarettes and cigars, narcotics and all of the things purchased with the proceeds of Susan's prostitution. The jury also heard Duchamp

30

testify that from his investigation, he believed that this was a situation where Susan was willing to participate and work together with Simon, her trafficker, to engage in prostitution. The jury could have believed Susan's initial testimony that the text messages extracted from Simon's phone were an accurate representation of what took place. The jury was presented with copies of the text messages extracted from Simon's phone that contained text messages between the owner of the phone and "buyers" negotiating the purchase of sexual services from Susan and texting pornographic images of Susan to buyers that are either like or the same as the images of Susan that are in the Skipthegames ads. The jury heard the SANE testify that her interview and examination of Susan raised several "red flags" suggesting that Susan had been trafficked: that Simon was older than Susan; that Susan mentioned the motel room; that Susan had many dealings with law enforcement; that law enforcement knew Susan as a different name; the story about the events at the park leading up to Susan's arrest that did not make sense and seemed like there was "something more to it[;]" and that Susan was guarded when answering the SANE's questions and would pause for long periods and then give vague answers. The jury heard the SANE's testimony and Duchamp's testimony that protecting the perpetrator is common for victims of trafficking. The jury heard Susan's testimony that she did not want to be at the trial, that she still cared for Simon, that it was "complicated" for her to be at the trial with him, and the jury could have reasonably

31

inferred that Susan was denying Simon's involvement in her prostitution in order to protect him. The jury could have reasonably inferred from the evidence extracted from Simon's phone and Duchamp's testimony that Simon helped post the ads involving Susan and negotiated with "buyers" who responded to the ads. The jury heard evidence that Simon received a benefit from participating in a venture that involved trafficking Susan, a child younger than 18 years of age, including Susan's testimony that she would buy food and drugs for Simon with the money she earned from prostitution, and that she bought him a gun with the money. The jury also could have considered Susan's testimony that Simon did not have a job and that his money came from Susan, and the jury could have reasonably inferred that Simon, at a minimum encouraged, aided in, and profited from her prostitution. As for Simon's arguments on appeal that Duchamp's and the SANE's testimony was speculative or conclusory, he did not make that objection at trial, so he cannot complain on that basis waived those arguments on appeal. *See* Tex. R. App. P. 33.1.

Having viewed the evidence in the light most favorable to the verdict, we conclude that a rational factfinder could have found beyond a reasonable doubt that Simon, two or more times in more than a thirty-day period (from on or about September 12, 2019, through on or about October 22, 2019, either (1) knowingly trafficked Susan, a child younger than 18 years of age, and by any means caused Susan to engage in, or become the victim of Compelling Prostitution; or (2)

knowingly received a benefit from participating in a venture that involved trafficking Susan, a child younger than 18 years of age, and by any means caused Susan to engage in, or become the victim of Compelling Prostitution. *See Jackson*, 443 U.S. at 319; *Lucio*, 351 S.W.3d at 894; *Hooper*, 214 S.W.3d at 13. The jury was able to assess the credibility and demeanor of the witnesses who testified at trial, and we presume that the jury resolved all conflicts in the testimony, weighed the evidence, and drew reasonable inferences from the evidence in a manner that supports the verdict. *See Hooper*, 214 S.W.3d at 13; *Brooks*, 323 S.W.3d at 899 n.13; *Clayton*, 235 S.W.3d at 778. "This was not a determination so outrageous that no rational trier of fact could agree." *Wirth v. State*, 361 S.W.3d 694, 698 (Tex. Crim. App. 2012). We overrule Appellant's issue on appeal and affirm the trial court's judgment.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on January 23, 2024
Opinion Delivered June 26, 2024
Do Not Publish

Before Horton, Johnson and Wright, JJ.

33